D. Maimon Kirschenbaum
Lucas C. Buzzard
JOSEPH & KIRSCHENBAUM LLP
32 Broadway, Suite 601
New York, New York 10004
Tel: (212) 688-5640
Fax: (212) 688-2548

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

**JANE LISS,**

          **Plaintiff,**

  v.

**HERITAGE HEALTH & HOUSING, INC.,**

          **Defendant.**
-------------------------------------------------------------x

**Docket No.:**

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

Plaintiff Jane Liss, alleges as follows:

### JURISDICTION AND VENUE

1. This Court has original federal question jurisdiction over under 28 U.S.C. § 1331 over Plaintiff's federal claims brought pursuant to the False Claims Act, 31 U.S.C. § 3729. This Court has supplemental jurisdiction over the New York state law claims, as they are so related to the claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

2. Venue is proper in this District because Defendant conducts business in this District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

## PARTIES

3. Defendant Heritage Health & Housing, Inc. ("Heritage") is a New York not-for-profit corporation that provides health care and housing services to members of the Harlem community.

4. Heritage is managed by a nine-member Board of Directors (the "Board"), which is responsible for, *inter alia*, hiring and evaluating the organization's Chief Executive Officer ("CEO").

5. Heritage is primarily funded by Federal and State grants and patient service revenues.

6. From at least 2015 to the present, Heritage has received annual grants from the U.S. Health Resources & Services Administration ("HRSA"). One such grant is HRSA Grant Number H80CS11285.

7. In 2015, 2016, 2017, and 2018 Heritage successfully applied to HRSA for a continuation of the funding under Grant Number H80CS11285. Heritage requested these funds for the purpose of providing "uninterrupted primary care services," including "primary medical care, dental services, and behavioral health care."

8. In 2018, Heritage was awarded financial assistance of approximately $2,231,676.00 under HRSA Grant Number H80CS11285.

9. In connection with each of its applications for continuation of Grant Number H80CS11285, Heritage was required to complete and submit HRSA Form SF-424.

10. As a recipient of HRSA Grant Number H80CS11285, Heritage must comply with the standards and requirements for financial management systems set forth in 45 C.F.R. part 75. Pursuant to these requirements, Heritage must: (1) ensure that its accounting records are supported

by source documentation, *see* 45 C.F.R. § 75.302(b)(3); and (2) provide effective control over and accountability of all funds, property, and other assets to ensure that they are used solely for authorized purposes, *see* 45 C.F.R. § 75.302(b)(4).

11. By completing and submitting HRSA Form SF-424, Heritage certified its compliance with the standards and requirements for financial management systems set forth in 45 C.F.R. part 75.

12. This HRSA funding is for use on the health care side of Heritage's operations.

13. This includes the operation of the Heritage Health Center (the "Health Center"), a Federally Qualified Health Center that receives grant funding from HRSA pursuant to Section 330 of the Public Health Service Act.

14. The Health Center provides medical services to low-income community residents, including primary care, dental services, and behavioral health services.

15. Heritage also receives funding in the form of grants from the New York State Office of Mental Health ("OMH").

16. Upon information and belief, from July 2016 to July 2017, Heritage received in excess of $7 million from OMH.

17. The funding received from OMH was to be used primarily for the housing side of Heritage's operations.

18. Heritage also receives funding from the New York City Department of Homeless Services and the New York City Department of Health and Mental Hygiene.

19. Plaintiff Jane Liss was employed as Heritage's CEO from May 1, 2018 to October 31, 2018, when Heritage terminated her employment.

**FACTS**

20. Heritage has a long history of documented mismanagement.

21. In approximately October 2016, Heritage's then-CEO, Alvaro Simmons, resigned after a whistleblower revealed he had misrepresented that he had a Ph.D. degree.

22. At the time of Mr. Simmons's resignation, Saundra Alexander was a member of Heritage's Board, serving as its Treasurer.

23. Immediately upon Mr. Simmons's termination, Ms. Alexander announced that she would be taking over as interim CEO.

24. Before taking over as interim CEO, Ms. Alexander did not formally resign her position as Treasurer of the Board of Directors, as required by HRSA as a condition of its funding.

25. Upon information and belief, Ms. Alexander was never formally nominated to serve as interim CEO before she took over the position and the Board never formally approved or voted on her assumption of that position before she took control.

26. Compliance with both of these procedures was required by HRSA as a condition of its funding of Ms. Alexander's position through the grants that had been awarded to Heritage, including Grant Number H80CS11285.

27. As interim CEO, Ms. Alexander received an annual salary of approximately $200,000, which was funded primarily by HRSA and OMH.

28. In May 2017, New York's OMH sent a letter to Heritage in which it stated that the fiscal mismanagement and incompetence on the part of Heritage's Board and Executive Staff, made it "impossible for OMH to have any reasonable assurance that Heritage can continue to manage its operations."

29. In its May 2017 letter, OMH flagged numerous long-standing issues concerning the "fiscal mismanagement" of Heritage, the failure of its Board of Directors to "fulfill its fiscal and programmatic oversight responsibilities," and the "toxic environment that permeates the organization."

30. In particular, the OMH noted that, as of the date of its May 2017 letter:

   a. Heritage website still listed Alavaro Simmons as the CEO, which led the OMH to conclude that Heritage "lack[ed] the competency to ensure current and accurate information is available to the public; Heritage is deliberately misrepresenting itself' or former employees are still making management decisions . . . ."

   b. HHH had repeatedly submitted "inaccurate and/or incomplete accounting information" to State auditors and failed to maintain "basic fiscal reports (such as cash flow projections)";

   c. OMH had received "anonymous allegations, with extensive documentation and evidence, raising concerns regarding board [of directors] misconduct and that the . . . CFO and Heritage leadership may be misusing funds"; and

   d. Personnel decisions made by Heritage's Board of Directors "appear to have been made by individuals with conflicts of interest" and OMH believed that "the Board has put Heritage in serious jeopardy."

31. As a result of these findings, OMH discontinued its funding of Heritage and began to transition the services Heritage provided to a different organization.

32. In September and early October 2017, Heritage laid off numerous employees on the housing side of the organization due to the loss of OMH funding.

33. In or about September 2017, Heritage hired a new CEO, Dr. Beverly Mosquera. She remained CEO at Heritage for less than two weeks before resigning.

34. Upon Dr. Mosquera's resignation, Saundra Alexander once again resumed the title of interim CEO.

35. In or about October 2017, Adrienne Thomas – upon information and belief Saundra Alexander's close personal friend and neighbor – became Chairperson of Heritage's Board of Directors.

36. In or about February 2018, a whistleblower filed a lawsuit against Heritage alleging that he was terminated one day after raising concerns, in connection with a HRSA audit of the organization, that Ms. Alexander had written off tens of thousands of dollars' worth of unpaid bills from Heritage Healthcare Center for dental work she had received.

37. On May 1, 2018, Plaintiff Liss was hired as CEO of Heritage.

38. Plaintiff's mandate as the new CEO was to improve Heritage's reputation.

39. Under the terms of her employment, Plaintiff was hired for a six-month probationary period, during which she received an annualized salary of $150,000 and no benefits.

40. The six-month probationary period was scheduled to end on November 1, 2018.

41. After the completion of that six-month probationary period, and following a review, Plaintiff's salary was to increase to $200,000 per year, plus benefits.

42. Several days after Plaintiff was hired, the Heritage Board of Directors issued a resolution transferring signatory authority and access to Heritage's bank accounts from Ms. Alexander to Plaintiff.

43. During this process, Plaintiff learned that Heritage maintained over twenty accounts in various banks, including TD Bank and Chase.

44. Despite the Board's May 2018 resolution, it took more than three months for the signatory authority for all accounts to be transferred to Plaintiff.

45. In July 2018, Plaintiff raised the issue of the delays in the transfer of signatory authority with Heritage's Board of Directors.

46. In or about August 20, 2018, Plaintiff finally received access to all of Heritage's numerous bank accounts. Upon being granted access, Plaintiff directed Heritage's finance department to begin reviewing the accounts and reconciling the transfers to and from those accounts.

47. Several days later, Heritage's Chief Financial Officer ("CFO"), Douglas Blomberg, brought several irregularities to Plaintiff's attention.

**Suspected Fraudulent Checks Issued to Heritage's Prior CEO, Alvaro Simmons**

48. The first irregularity concerned three checks written from the Heritage Health Center's Operating Account at Chase Bank, Account Number Ending *8665 (the "8665 Chase Account"), that were dated January 23, 2018, February 12, 2018, and June 26, 2018.

49. All three checks were for amounts in excess of ten thousand dollars ($15,000, $12,800, and $18,300, respectively) and were all made payable to the former Heritage CEO, Alvaro Simmons, who had resigned from Heritage in October 2016 after a whistleblower disclosed that he had misrepresented having a Ph.D.

50. Two of the checks (January 2018 and February 2018) were signed by Saundra Alexander; the third check (June 2018) was signed by Adrienne Thomas.

51. None of the three checks were endorsed with a signature on the endorsement section on the rear of the checks. Instead, the endorsement section of all three checks bore only the handwritten notation that they were for deposit "only to fidelity."

52. Plaintiff's review of the statements of the 8665 Chase Account for the months when the suspect checks were cashed raised further suspicions because the check numbers of the checks written to Alvaro Simmons were not in order with the check numbers of all the other checks written from the 8665 Chase Account during the corresponding periods.

53. For example, the check written to Alvaro Simmons dated June 26, 2018 appeared as a "cleared check" on the July 2018 statement of the 8665 Chase Account. Three other checks also appeared as "cleared checks" on that July 2018 statement. The check numbers of these other checks were consecutive – 8228, 8229, and 8230. By contrast, the check number on the check written to Alvaro Simmons was 8319, nearly one hundred numbers off from the other checks.

54. Concerned by the disparity in the check numbers in the checks written to Alvaro Simmons, Plaintiff examined the checkbook for the 8665 Chase Account and discovered that checks bearing the numbers of the three checks written to Alvaro Simmons (8315, 8316, and 8319) still remained in the checkbook for the 8665 Chase Account.

**Suspect Online Transfers from Heritage Accounts**

55. The second irregularity concerned online transfers from Heritage accounts for unknown and suspect purposes.

56. For example, Plaintiff's review of the statements for the 8665 Chase Account revealed that between June and September 2018, three electronic transfers that together totaled more than $30,000 had been made from that account to "TD Ameritrade," an online stock trading and investment company.

57. These unexplained transfers to an online stock trading company raised serious concerns for Plaintiff given that Heritage is a nonprofit corporation primarily funded by grants from the federal and state governments.

8

**Suspect Transfers from Heritage Accounts to Accounts Plaintiff was Informed Belonged to Saundra Alexander**

58.     The third irregularity concerned online transfers between Heritage accounts and accounts that bank personnel told Plaintiff belonged to Saundra Alexander.

59.     In reviewing the Heritage bank account statements, Plaintiff noticed several online transfers between the 8665 Chase Account and two unidentified accounts, with account numbers ending 6865 ("Unidentified Account 6865") and 9724 ("Unidentified Account 9724").

60.     These transfers were for substantial sums.  For example, the 8665 Chase Account records indicated that (1) on September 15, 2017, $50,000 had been transferred from the 8665 Chase Account to Unidentified Account 6865; (2) on October 16, 2017, $54,145.18 had been transferred to Unidentified Account 9724; and (3) on November 2, 2017, $50,000 had been transferred from Unidentified Account 9724 to the 8665 Chase Account.

61.     On or about October 15, 2018, Plaintiff visited a JP Morgan Chase branch in Harlem to meet with the bank's customer claims department and inquire about these and other suspect transfers.

62.     During the course of that meeting, Plaintiff was informed by Chase bank staff that Unidentified Accounts 6865 and 9724 belonged to Saundra Alexander.

**Plaintiff Raises Her Concerns about the Irregularities with the Heritage Board**

63.     On October 17, 2018, the Heritage Board of Directors, with Adrienne Thomas as Chairperson, held a meeting at which Plaintiff brought examples of suspicious banking activities to the Board's attention, including the above examples.

64.     During this meeting, Plaintiff also informed the Board that her investigation and the information provided by Chase personnel had led her to believe that Saundra Alexander was involved in the suspicious transfers.

9

65. Ms. Alexander was present at this Board meeting as the Board was scheduled to vote on whether she should be reinstated to a position on the Board.

66. At the conclusion of Plaintiff's presentation, the Board requested that she report her findings to the appropriate law enforcement authorities, including the Federal Bureau of Investigation.

67. However, later during that same meeting, on the motion of Adrienne Thomas, the Board voted 5-1 to reinstate Ms. Alexander as a Board member.

68. Two days after this Board meeting, Ms. Thomas ordered Plaintiff to attend a meeting with herself and two other Board members, John Cardwell and Noel Weekes, during which she informed Plaintiff that her probationary period of CEO would not expire on November 1 as anticipated but instead would be continued indefinitely.

69. The only justification Ms. Thomas provided to Plaintiff for the extension of the probationary period was that Plaintiff did not say "Good Morning" to her staff on a regular basis.

70. On October 22, 2018, Plaintiff sent a letter to the members of the Board of Directors in which she stated her belief that the extension of her probationary period constituted impermissible retaliation against her for bringing to light the suspicious banking activities.

**Plaintiff Discovers Additional Suspect Transactions**

71. Following the October 17 Board meeting, Plaintiff discovered further irregularities in Heritage's accounts. These discoveries concerned checks worth hundreds of thousands of dollars that (a) were written from Heritage accounts, (b) were made payable to Heritage itself, (c) were endorsed to be deposited in specific Heritage accounts in which (d) the amount on the checks never appeared.

72. For example, Plaintiff discovered check number 8207 from the 8665 Chase Account that was dated October 11, 2017, written in the amount of $230,000, signed by Saundra Alexander, and made payable to "Heritage Health & Housing, Inc."

73. The bank statement for the 8665 Chase Account contained a copy of the rear of check 8207, on which had been stamped the endorsement that it was "for deposit only" into the "Heritage Health Care TD Bank" operating account number ending *7439 (the "7439 TD Bank Account"). The 8665 Chase Account bank statement also indicated that check number 8207 had posted on October 13, 2017.

74. However, Plaintiff's review of the October 2017 bank statement for the 7439 TD Bank Account revealed that no deposits had been made into that account on October 13, 2017 and, furthermore, no deposits in the amount of $230,000 (the amount of check 8207) had been made into the 7439 TD Bank Account, or into any other Heritage account to which Plaintiff had access during the entire month of October 2017.

**Plaintiff's Termination**

75. On October 22, 2018, Plaintiff reported her concerns about the suspicious banking activity to Israel Garcia, a Senior Public Health Analyst at HRSA and Heritage's primary contact at HRSA. Mr. Garcia scheduled a conference call to address the allegations and directed Plaintiff to prepare a summary in advance of that call that included information about: (1) a "checks and balances plan for cash flow and [the] organization's bank accounts"; (2) "[e]stablishing a structure in place to delegate authority to key management staff"; (3) a description of "[b]oundaries established to protect the organization from jeopardizing federal funding," including "[b]oard recruitment plans and board selection." Mr. Garcia also informed Plaintiff that he would ask for

a "status update from the board regarding prior allegations (law suits, fraud allegations, etc.) and actions taken."

76. On October 24, 2018, Mr. Garcia of HRSA held a conference call attended by Plaintiff, Mr. Blomberg (Heritage's then-CFO), and Board Members Wanda Garcia, Adrienne Thomas, and Noel Weekes.

77. During the conference call, Mr. Israel Garcia stressed that Heritage must ensure the financial integrity of its accounts, should seek legal advice as to how to establish "checks and balances" with respect to its finances, and should "exercise due diligence" regarding reporting and the identity of individuals who have access to Heritage accounts. He also stated that a federal investigation into Heritage's action was "ongoing" and that such investigations were "public records" that could "affect future funding applications."

78. One major point of discussion during the call was the Board's severe lack of governance. Specifically, Mr. Garcia stated that: (1) Ms. Alexander "should not be on the board" given the various investigations into her conduct; (2) the Board "need[ed] to be unanimous in the votes [and] no one board member should be making solo decisions without reviewing [them] before the board"; and (3) "Board chairs," *ie.*, Ms. Thomas, "cannot be acting on their own."

79. Finally, Mr. Garcia was made aware that the Board was going to hold an emergency meeting on October 30, 2018 "regarding [Plaintiff's] allegations."

80. An email sent to HHH Board members informing them of this emergency meeting stated that it would be held at the HHH Main Office at 5:30pm on October 30, 2018.

81. At 5:30pm on October 30, 2018, Plaintiff was waiting at the HHH Main Office to attend the emergency Board meeting.

82. None of the Board members arrived at the HHH Main Office for the scheduled emergency meeting.

83. Plaintiff was later informed that the Board had voted that evening to remove her as CEO. Upon information and belief, Ms. Alexander was permitted to vote for Plaintiff's dismissal.

84. Plaintiff's Heritage email account was disabled later that night.

85. On October 31, 2018, Plaintiff was escorted from Heritage by security shortly after she reported to work.

86. Later that same day, Ms. Thomas emailed Plaintiff at her personal email address, stating that she had been removed for "poor work performance."

87. Prior to October 17, 2018, the date when she reported the suspicious banking activity to the Board, Plaintiff had received no complaints about her work performance at Heritage.

## FIRST CLAIM FOR RELIEF
### (Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h))

88. Plaintiff realleges and incorporates by reference all previous paragraphs.

89. The False Claims Act ("FCA") imposes liability on any person who: (1) knowingly presents or causes to be presented a "false or fraudulent claim for payment or approval" by the federal government; (2) knowingly "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) knowingly "makes, uses, or causes to be used, a false record or statement material to an obligation to pay or transmit money or property to the Government"; (4) knowingly "conceals or . . . improperly avoids or decreases an obligation to pay or transmit money or property to the Government"; or (5) "conspires" to commit any of the above acts. 31 U.S.C. § 3729(a)(1).

90. The FCA anti-retaliation provision prohibits an employer from discriminating in any manner against an employee because of his "efforts to stop 1 or more violations of" the FCA. 31 U.S.C. § 3730(h).

91. Heritage's initial application for Grant Number H80CS11285, its applications for continuation of Grant Number H80CS11285, and all requests for payment under Grant Number H80CS11285 all constitute "claims for payment" within the meaning of the False Claims Act.

92. Here, Plaintiff reasonably and in good faith believed that the irregularities and suspect fraudulent activities she uncovered that reflected mismanagement, misappropriation, and possible theft of Heritage funds violated Heritage's assurances made in connection with these claims for payment, thus constituting violations of the FCA, 31 U.S.C. § 3729(a)(1).

93. Plaintiff engaged in protected activity under the FCA when she attempted to put a stop to these illegal practices by investigating the suspicious banking activity and reporting it to the Board of Directors.

94. Defendant's reprisal against Plaintiff by: (1) extending her probationary period of employment two days after she reported the suspicious activity; and (2) terminating her employment less than two weeks after she reported the suspicious activity, constitutes illegal retaliation for Plaintiff's protected activity under the FCA.

95. Defendant's conduct was intentional, deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

96. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and will continue to suffer harm, and is entitled to all equitable and legal remedies available under the FCA, law including, but not limited to, reinstatement, restoration of benefits, an award of two times the amount of back pay, front pay, compensatory damages for emotional

distress, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the New York False Claims Act, N.Y. State Finance Law § 191)

97. The New York False Claims Act ("NYFCA") imposes liability on any person who: (1) knowingly presents or causes to be presented a "false or fraudulent claim for payment or approval" by the state or a local government; (2) knowingly "makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim"; (3) knowingly "makes, uses, or causes to be used, a false record or statement material to an obligation to pay or transmit money or property to the state or a local government"; (4) knowingly "conceals or . . . improperly avoids or decreases an obligation to pay or transmit money or property to the state or a local government"; or (5) "conspires" to commit any of the above acts.  N.Y. State Fin. Law § 189(1).

98. The NYFCA anti-retaliation provision prohibits an employer from discriminating in any manner against an employee because of his "efforts to stop one or more violations of" the NYFCA.  N.Y. State Fin. Law § 191(1).

99. Here, Plaintiff reasonably and in good faith believed that the mismanagement, misappropriation, and possible theft of Heritage funds constitute violations of the NYFCA, N.Y. State Fin. Law § 189(1).

100. Plaintiff engaged in protected activity under the NYFCA when she attempted to put a stop to these illegal practices by investigating the suspicious banking activity and reporting it to the Board of Directors.

101. Defendant's reprisal against Plaintiff by: (1) extending her probationary period of employment two days after she reported the suspicious activity; and (2) terminating her

15

employment less than two weeks after she reported the suspicious activity, constitutes illegal retaliation for Plaintiff's protected activity under the NYFCA.

102. Defendant's conduct was intentional deliberate, willful, and conducted in callous disregard for Plaintiff's protected rights.

103. As a direct and proximate result of Defendant's illegal conduct, Plaintiff has suffered and will continue to suffer harm, and is entitled to all equitable and legal remedies available under the NYFCA, law including, but not limited to, reinstatement, restoration of benefits, an award of two times the amount of back pay, front pay, compensatory damages for emotional distress, punitive damages, attorneys' fees and costs, and such other legal and equitable relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant as follows:

(A)  For compensatory and punitive damages in an amount to be determined by the trier of fact;

(B)  For reasonable attorneys' fees, interest, and costs of suit;

(C)  For such other and further relief as the Court may deem just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which has a right to jury trial.

Dated: New York, New York               Respectfully submitted,
      May 22, 2019                                JOSEPH & KIRSCHENBAUM LLP

                                                       By:   *s/Lucas C. Buzzard*
                                                                D. Maimon Kirschenbaum
                                                                Lucas C. Buzzard
                                                                 32 Broadway, Suite 601
                                                                New York, NY 10004
                                                                Tel: (212) 688-5640
                                                                Fax: (212) 688-2548