UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

JANE LISS,

       Plaintiff,

   -v-                                   No.   1:19-cv-4797-LTS-SDA

HERITAGE HEALTH & HOUSING, INC.,

       Defendant.

-------------------------------------------------------x

<u>MEMORANDUM ORDER AND OPINION</u>

Plaintiff Jane Liss ("Plaintiff" or "Liss") brings this action against Defendant Heritage Health & Housing, Inc. ("Defendant" or "Heritage") under the federal False Claims Act (31 U.S.C. sections 3729 and 3730) and the New York False Claims Act (N.Y. Fin. Law sections 189 and 191), alleging that Heritage unlawfully terminated her employment in retaliation for her actions as a whistleblower in uncovering financial mismanagement at Heritage. (Docket entry no. 1 ("Compl.").) The Court has jurisdiction of this action pursuant to 28 U.S.C. sections 1331 and 1367.

Heritage moves, pursuant to Federal Rule of Civil Procedure 56, for summary judgment on all of Plaintiff's claims against it, arguing that Plaintiff is unable to satisfy the elements of her False Claims actions as a matter of law. The Court has considered carefully all of the parties' submissions and arguments. For the reasons explained below, Heritage's motion for summary judgment is granted.

<u>BACKGROUND</u>

Unless otherwise indicated, the following facts are undisputed.[1]  Heritage Health & Housing is a not-for-profit organization located in Harlem which provides housing, health care, and social support services to the community.  (Heritage 56.1 St. ¶ 1.)  Heritage is managed by a nine-person Board of Directors ("the Board"), and regularly receives Government grants to funds its operations—including grants from the U.S. Health Resources and Services Administration ("HRSA"), the New York City Department of Homeless Services, and the New York City Department of Health and Mental Hygiene.  (Liss Add. 56.1 St. ¶ 1-9.)

In early 2018, the Board began to search for a new CEO, and Jane Liss applied for the position.  (Heritage 56.1 St. ¶ 2-3.)  The Board had decided to hire a new CEO to help improve the organization's image, oversight, and financial practices.  (Id.)  In May 2018, the Board extended Liss an offer of employment with a six-month probationary period, and she accepted.  (Heritage 56.1 St. ¶ 4; Liss Add. 56.1 St. ¶ 39.)  As CEO, her duties included overseeing the operations and finances of the organization and acting as the point of contact between the Board and Heritage's staff.  (Liss Counter 56.1 St. ¶ 4.)  In the years leading up to Liss' hiring, Heritage had experienced significant employee layoffs and management turnover (with 3 different CEOs from 2016-2018); a publicized whistleblower lawsuit (in which an employee accused Board member Saundra Alexander of misappropriating funds from the organization); and a state of general financial mismanagement and disorganization (which

---

[1]     Facts characterized as undisputed are identified as such in the parties' statements pursuant to S.D.N.Y. Local Civil Rule 56.1 or drawn from evidence as to which there has been no contrary, non-conclusory factual proffer.  (See docket entry no. 37 ("Heritage 56.1 St."); docket entry no. 46 ("Liss Counter 56.1 St."); docket entry no. 47 ("Liss Add. 56.1 St.").)  Citations to the parties' respective Local Civil Rule 56.1 Statements incorporate by reference the parties' citations to underlying evidentiary submissions.

caused the organization to lose several valuable government grants and contracts in 2017 and 2018).[2]  (Heritage 56.1 St. ¶ 2-4; Liss Add. 56.1 St. ¶ 12-14, 18-19, 21-24, 31.)

In the months after Liss began as CEO, Heritage staff made a number of complaints[3] that characterized Liss' management style as harsh and her behavior as insensitive. In July 2018, HR Director Jamela Irvin reported that Liss would not listen when she tried to explain union work rules, that Liss "spoke down to her in a derogatory way," and that Liss was "very rude and dismissive" with staff members.  (Docket entry no. 39-3, ¶ 11; docket entry no 39-17.)  Also in July 2018, Director of Operations Jennifer Martinez reported that Liss rudely denied her request to attend a work conference, told Martinez to "stay in [your] lane," and remarked that she was "a typical Hispanic."  (Docket entry no. 39-4, ¶ 3.)  Martinez stated that she found Liss to be "incredibly insensitive," and that Liss would refer to Heritage's "mostly minority staff and patient base" as "these people."  (Id. ¶ 2.)  Martinez also reported that in September 2018, after staff had complained about a delay in their paychecks, Liss told staff that "you people should not live paycheck to paycheck."  (Id. ¶ 4.)

In August 2018, staff member Felishea Velazquez Sanchez filed a complaint about Liss, stating that Liss had "created an uncomfortable atmosphere" amongst the staff, that

---

[2]     For example, in a May 2017 letter, the NY Office of Mental Health ("OMH") sent Heritage a letter expressing "very deep concerns" about the organization's operations, such as "(1) longstanding organizational culture problems, (2) financial mismanagement, (3) character and competence concerns, (4) quality and licensing deficiencies, and (5) failure by the Heritage Board to fulfill its fiscal oversight responsibility and duties to staff."  (Docket entry no. 48-4.)  Soon after the receipt of this letter, OMH terminated its contracts with Heritage.  (Liss Add 56.1 St. ¶ 16-18.)

[3]     The Court notes that, while it is undisputed that these staff complaints existed, the underlying events are disputed.  Liss maintains that she never made any inappropriate or insensitive comments to Mr. Rodgers, Ms. Martinez, Ms. Irvin, Ms. Hutchek, or any other staff member.  (Docket entry no. 49, Declaration of Jane Liss, ¶ 38-41; Liss Counter 56.1 St. ¶ 6.)

Liss "lacks professionalism," and that Liss made her feel "bullied, picked on, and harassed." (Docket entry no. 39-18.)  Sanchez felt that she was "being racially profiled in the way [Liss] speaks down to me" and that her interactions with Liss were "degrading."  (Id.)  In September 2018, Facilities Director Norman Rodgers made a complaint about Liss, detailing what he characterized as several "irrational decisions [by Liss] that put Heritage at risk," as well as describing how he "witnessed Liss make offensive and racially insensitive comments about me and about others."  (Docket entry no. 39-5, ¶ 1-8.)  He described how Liss spoke in demeaning terms about Heritage's housing tenants, stating that they were "hanging out like animals" outside of the building.  (Id. ¶ 4-6.)  On another occasion, Liss speculated that "those people" were probably stripping parts from Heritage's maintenance vehicles, and told Rodgers that "they must be your cousins"—Rodgers was "sickened and humiliated" by this encounter.  (Id. ¶ 4-6.)  In September 2018, staff member Erica Hutchek complained that Liss berated her for being unable to timely commute into the office due to late-issued paychecks, with Liss telling Hutchek she was "disloyal" and that she should have saved up more money.  (Docket entry no. 39-6, ¶ 1-7.)  In total, 5 staff members at Heritage lodged complaints about Liss from July to September 2018.

Amidst these ongoing staff complaints, Liss was engaging in her financial oversight duties as the new CEO.  Liss initially had some difficulties in gaining access to Heritage's bank accounts, but in August 2018 she managed to transfer authority over the bank accounts into her name.  (Liss Add. 56.1 St. ¶ 41-50.)  After receiving full access to Heritage's bank statements, Liss gave the bank statements to Douglas Blomberg (the CFO), who was in the process of reconciling Heritage's accounts.  (Id. ¶ 51-52.)  Blomberg soon discovered some suspicious activity in Heritage's accounts (including some suspicious checks and suspicious wire transfers), and brought these matters to Liss' attention.  (Id. ¶ 58.)  The three suspicious checks

had all been drawn from the same account number, and all three were made out to Alvaro Simmons (a former CEO of Heritage) in amounts ranging from $12,000 to $18,000.  (Id. ¶ 59-60.)  The checks were dated January 2018, February 2018, and June 2018, and bore the signatures of either Saundra Alexander or Adrienne Thomas (who were both Board members).  (Id.)  As for the suspicious wire transfers, some were made in 2017, but the most recent transfers occurred in June 2018 for $13,000 and in July 2018 for $8,800.  (Id. ¶ 61-65.)  After consulting with Heritage's bank in early October 2018, Liss discovered that the transfers had both been sent to accounts bearing the name of Saundra Alexander.  (Id. ¶ 61-65.)  Liss suspected that these transactions might be indicia of fraud, and began preparing to present her findings on these financial irregularities to the Board.  (Id. ¶ 65-70.)

Meanwhile, some Board members were beginning to take action regarding the staff complaints about Liss' behavior.  In late September 2018, several Board members (including Adrienne Thomas) attended a Heritage staff meeting "to give staff some assurance that the Board was aware that things were not right, and that [they] would be addressing the problems" with Liss.  (Docket entry no. 39-3, ¶ 17.)  Though Thomas "did not mention Liss by name" at this meeting, staff members "understood that Thomas was referring to Liss' behavior." (Id.; docket entry no. 39-4, ¶ 4-6.)  Thomas told staff that "I am here; we hear you; and we will fix this."  (Docket entry no. 39-6, ¶ 8.)

A regularly scheduled Board meeting was set to occur on October 17, 2018.   In anticipation of this upcoming meeting, Thomas began to prepare a presentation advocating for Liss' termination, and also began to discuss her concerns with certain board members.  (Docket entry no. 39-3, ¶ 17-19.)  Board members Monica Braggs, John Cardwell, and Earl Washington all state (in declarations) that Thomas spoke with them privately during early October 2018 to

share her concerns regarding Liss, and to inform them that she planned to ask the Board to terminate Liss.  (Docket entry nos. 39-9, ¶ 6; 39-10, ¶ 4; 39-11, ¶ 6.)

On October 15, 2018, Liss had a private meeting with Board member Noel Weekes to discuss the suspicious financial transactions she and Blomberg had discovered—Weekes likewise found the checks to be concerning and advised Liss to bring this information to the full Board's attention.  (Docket entry nos. 39-16, at 55-57; 39-14 at 49-51.)  According to Liss, at this same meeting, Weekes also told Liss that Adrienne Thomas had begun to advocate for Liss' termination as CEO.  (Liss Add. 56.1 St. ¶ 66-67.)

On October 17, 2018, at the regularly scheduled meeting of the Board, several notable events took place.  First, Liss made her report to the Board about the financial irregularities she had discovered (the suspicious checks and wire transfers), and the Board agreed unanimously that Liss should bring this matter to the attention of law enforcement as soon as possible.  (Docket entry no. 39-21, at 5.)  Second, after Liss had left the meeting, the Board began its "executive session," during which Thomas formally recommended that the Board terminate Liss, summarized her concerns about Liss' behavior, and distributed to the Board folders of materials documenting all of the staff complaints lodged against Liss.  (Id. at 6; Heritage 56.1 St. ¶ 10-11; Liss Counter 56.1 St. ¶ 8-11.)  Based on this information, several Board members indicated they were inclined to terminate Liss immediately, but other Board members requested more time to deliberate on the matter.  (Id.)  The Board ultimately voted to extend Liss' probationary period for the time being (as opposed to transitioning her from probationary status to regular employee status, as had been previously planned).  (Id.)

On October 19, 2018, several Board members met with Liss to present her with a performance evaluation and to inform her of the Board's decision to extend her probationary

period.  (Heritage 56.1 St. ¶ 12; Liss Counter 56.1 St. ¶ 12.)  Liss objected to the Board's decision and refused to sign the evaluation, informing them that "an extension of her probationary period would not work for her" because she required a stable position with health insurance coverage.  (Id.)  October 22, 2018, Liss spoke with Sandra Blundetto (Heritage's general counsel), expressing her belief that the Board had extended her probationary period in retaliation for her bringing up the suspicious financial activity.  (Liss Add. 56.1 St. ¶ 97; Docket entry no. 50-2 ¶ 4.)  Blundetto advised Liss to put her concerns into writing, and later that evening Liss sent a detailed email to all Board members, expressing her belief that she had been "wrongfully and in bad faith threatened and retaliated against" because she had "brought federal banking and healthcare fraud to [the Board's] attention." (Docket entry no. 49-3, at 2.) Following the receipt of Liss' email, Board member Wanda Garcia communicated with the Board to request an emergency meeting of the Board to address Liss' allegations.  (Liss Add. 56.1 St. ¶ 103-104.)  The Board agreed, and the emergency meeting was scheduled for the evening of October 30, 2018.  (Id.)

   On October 24, 2018, Liss and several Board members participated in a conference call with Israel Garcia, a representative from HRSA who was assisting Heritage in its efforts to stay compliant with HRSA grant requirements.  (Docket entry no. 48-5.)  Garcia advised Heritage on a number of measures they should implement to improve their operations, such as taking more actions to "ensure financial integrity" and "improve accountability" in their bank accounts.  (Id. at 10-11).  At the end of the call, Liss informed Garcia about the fraudulent checks and transfers that she had discovered.  (Id.)

   Also on October 24, 2018, Adrienne Thomas sent a letter to the Board "in response" to the October 22 email from Liss.  (Docket entry no. 39-26.)  Thomas stated that the

Board was "glad to have been notified" that the suspected financial fraud was being "reported to the proper agencies who can resolve this situation." (Id.) Thomas further stated that it was "unfortunate that Ms. Liss feels as though she is being retaliated against" due to the extension of her probationary period, but asserted that the Board had reached this decision due to Liss' poor relationship with Heritage staff, and that the Board was considering "trying to obtain some type of training" for Liss to help her improve her staff relations. (Id.) Thomas expressed her belief that Liss was acting "irrationally" and in an "unprofessional" manner towards staff, and expressed concern that Heritage might "face several lawsuits in the future should the Board allow Ms. Liss to remain in her current position." (Id.)

On the morning of October 30, 2018, Liss went to the police station to file a report. She met with Detective Jackson Todd, and explained to him her findings on the fraudulent checks and transfers. (Docket entry no. 39-15, at 51-55.) Detective Todd informed Liss that he was already aware that Heritage was experiencing issues with suspected fraud in its bank accounts. (Id.) He explained that in November 2017 (and again in January 2018), Saundra Alexander had reported some suspicious wire transfers between her personal bank account and Heritage's bank account. (Id. at 19-20, 34-35.) Detective Todd had investigated the matter, but had ultimately determined that the money was simply being moved back and forth between various accounts,[4] that no withdrawals were ever made, and that Alexander was not considered a suspect. (Id. at 19-20, 34-39.) Because there were no leads on a potential suspect, the police had not taken any action on the matter and the case was closed in May 2018. (Id. at 34-39, 46-49.)

---

[4] The bank accounts involved in these transfers included (1) an account belonging to Heritage, (2) an account belonging to one of Heritage's clients, (3) Saundra Alexander's personal account, and (4) several fraudulent accounts opened under the names of various Board members. (Id. at 38-43.)

After hearing Liss' new information about the recent checks and transfers, Detective Todd reopened the case and performed further investigations into the accounts.  He ultimately concluded that the irregularities Liss reported appeared to be "a continuation of what had already been occurring"— "[s]omeone was victimizing" Heritage employees by "using their personal information" to open fraudulent accounts and to make these strange transfers, but not to actually withdraw any money.  (Id. at 53-55, 64-65.)  He concluded that the forged checks incident was "basic check fraud," and that "once the account number is in the hands of the criminal, they can . . . fabricate [counterfeit] checks" with relative ease.  (Id. at 57.)  Detective Todd surmised that the overall intent of the frauds seemed to be "more disruptive than, you know, a plan to steal money."  (Id. at 68.)  "Neither Simmons nor Alexander nor Thomas" were considered suspects in the fraud.[5]  (Id. at 79.)

In the evening of October 30, the Board held the emergency meeting to discuss both the allegations in Liss' email and the possibility of Liss' termination.  This meeting was held "at a nearby restaurant" and Liss was not invited.  (Docket entry no. 39-4, ¶ 8.)  Several staff members attended the meeting and voiced their complaints regarding Liss.  (Id.)  Jennifer Martinez played for the Board a recording of Liss speaking to Adrienne Thomas in "a rude and

---

[5]     Detective Todd further explained some of the reasons why he did not consider any of the Board members to be suspects.  First was the fact that the fraud had initially been reported by Saundra Alexander herself—"it made no sense that Alexander would steal money from the company, transfer it into her own bank account, and then report to the police department that someone was stealing money from the company."  (Id. at 38.)  Second, because the frauds involved the use of some very high-tech skills (such as use of a botnet to disguise IP addresses), he surmised that the suspect was someone "with a vast knowledge of computers"—a skill which he did not believe Alexander or the others to possess.  (Id. at 69-72, 83-85.)  Third, the fraudulent accounts that were opened in the names of the Heritage Board members contained numerous inaccuracies (such as using the wrong address, misspelling names, or mixing up the personal information of two different employees).  (Id. at 76-82.)

aggressive manner" at the workplace, which Martinez stated was "drawing the attention of patients" and "causing a scene." (Heritage 56.1 St. ¶ 13-14; docket entry no. 39-4 ¶ 7-8; 39-3 ¶23.)[6] CFO Doug Blomberg stated that he shared staff's concerns about Liss' behavior and found the situation untenable, and that he would resign if the Board did not vote to terminate Liss. (Heritage 56.1 St. ¶ 13-15; Liss Counter 56.1 St. ¶ 14-15.) After further discussion, the Board voted unanimously to terminate Liss' employment. (Id.)

Liss thereafter commenced this action against Heritage.

## DISCUSSION

Summary judgment is to be granted in favor of a moving party if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is considered "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is a genuine one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Holtz v. Rockefeller & Co. Inc., 258 F.3d 62, 69 (2d Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "Factual disputes that are irrelevant or unnecessary" to the outcome of the suit are not "material," and thus do not preclude summary judgment. Anderson, 477 U.S. at 248. To defeat summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir. 2002) (citation omitted). The nonmoving party "may not rely on mere conclusory allegations nor speculation, but instead must offer some

---

[6]     Liss acknowledges that this recording exists and that it was played for the Board at the emergency meeting, but disputes the characterization of "rude and aggressive." (Liss Counter 56.1 St. ¶ 14.)

hard evidence showing that its version of the events is not wholly fanciful." Golden Pac. Bancorp v. FDIC, 375 F.3d 196, 200 (2d Cir. 2004) (citation omitted).  When evaluating a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).

Liss asserts a retaliation claim under the federal False Claims Act ("FCA") and its New York state equivalent, the New York False Claims Act ("NYFCA").  In order for Liss to prove her retaliation claim, she must establish that (1) she engaged in conduct protected under those statutes; (2) Heritage was aware of her protected conduct; and (3) Heritage took adverse action against her because she engaged in the protected conduct.  See Knight v. Standard Chartered Bank, 531 F. Supp. 3d 755, 768 (S.D.N.Y. 2021) (citing 31 U.S.C. § 3730(h)).  The Court concludes that, although Liss can satisfy the first two elements of this test (she engaged in protected conduct of which that Heritage was aware), she has failed to demonstrate that there is a genuine issue of material fact as to whether the adverse action occurred because of her protected conduct.  Accordingly, Heritage is entitled to summary judgment as a matter of law.

Protected Conduct under the FCA

The FCA and the NYFCA are statutes that impose civil liability on parties who knowingly defraud the Government.  See 31 U.S.C. §§ 3729 – 3730; N.Y. State Fin. Law § 189(1).  The NYFCA "is closely modeled on the federal FCA" and "New York courts rely on federal FCA precedents when interpreting the NYFCA." U.S. ex rel. Bilotta v. Novartis Pharms. Corp., 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014) (citations omitted).  Relevant to Liss' claims, the FCA imposes liability on an individual who (1) "knowingly presents, or causes to be

presented, a false or fraudulent claim for payment or approval" to the government; or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" to the government.  31 U.S.C. § 3729(a)(1)(A)-(B); N.Y. State Fin. Law § 189(1)(A)-(B) (containing identical language).   "Courts generally treat these two provisions together, as their elements overlap significantly."  United States ex rel. Raffington v. Bon Secours Health Sys., Inc., 405 F. Supp. 3d 549, 555 (S.D.N.Y. 2019) (citation omitted).  In general, "fraud under the FCA has two components: the defendant must submit or cause the submission of a claim for payment to the government, and the claim for payment must itself be [knowingly] false or fraudulent."  United States ex rel. Tessler v. City of New York, 712 F. App'x 27, 29 (2d Cir. 2017).

        A claim can be "knowingly" false in three ways: (1) when the claim is made with "actual knowledge" of falsity; (2) when the claim is made with "deliberate ignorance of the truth or falsity of the information;" or (3) when the claim is made with "reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729 (b)(1); see also N.Y. State Fin. Law § 188(3). Additionally, there are various ways in which a claim for payment can be "false or fraudulent." As relevant here, a claim is "legally false" for purposes of the FCA where a party "certifies compliance with a statute or regulation as a condition to governmental payment, but is not actually compliant."  Raffington, 405 F. Supp. 3d at 555 (citation omitted).

        In the context of an FCA retaliation claim specifically, the FCA protects an employee who engages in "lawful acts done . . . in furtherance of . . . efforts to stop 1 or more violations of" the FCA.  31 U.S.C. § 3730(h)(1); see also N.Y. State Fin. Law § 191(1). Importantly, a retaliation plaintiff need not conclusively prove an FCA violation in order to recover.  "[P]roving a violation of § 3729 [submission of a false claim] is not an element of a §

3730(h) [retaliation] action"—an FCA retaliation claim can still succeed "even if the target of the investigation . . . was innocent."  See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson, 545 U.S. 409, 416, 428 n.1 (2005).  Instead, a retaliation plaintiff simply must show that she had a "good faith basis" or an "objectively reasonable basis" to believe that she was investigating an FCA violation occurring at her workplace.  See New York ex rel. Khurana v. Spherion Corp., 511 F. Supp. 3d 455, 473 (S.D.N.Y. 2021).  "Thus, it is enough to show that a plaintiff's investigation reasonably could have led to an FCA action."  Dhaliwal v. Salix Pharms., Ltd., 752 F. App'x 99, 100 (2d Cir. 2019) (citation omitted).  Moreover, the fact that "a potential plaintiff may fail to find such evidence [of FCA fraud] does not change the analysis of his or her retaliation claim, nor does the fact that he or she may not know that the investigation could lead to a suit under the FCA."  U.S. ex rel. Smith v. Yale Univ., 415 F. Supp. 2d 58, 103 (D. Conn. 2006).  "Protected conduct under the [FCA] is interpreted broadly."  Khurana, 511 F. Supp. 3d at 472.

        In the context of organizations that receive government grants, courts have found that an employee engages in protected FCA conduct when the employee makes complaints about the organization's suspected misuse of government funds.  See, e.g., Garcia v. Aspira of New York, Inc., No. 07-CIV-5600-PKC, 2011 WL 1458155, at *4 (S.D.N.Y. Apr. 13, 2011) (protected conduct found where nonprofit employee discovered that the organization was "creating and submitting fraudulent grant applications, budgets, and expense reports," and reported to management about "the company's misuse of government funds"); U.S. ex rel. Ellis v. Sheikh, 583 F. Supp. 2d 434, 438-39 (W.D.N.Y. 2008) (plaintiff adequately established FCA protected conduct where she discovered that a doctor at her clinic was overbilling patient time in Medicare claims and "informed her supervisor . . . of her concern that [the doctor] was

defrauding Medicare").

In contrast, an employee does not engage in FCA protected conduct when the employee simply exposes flawed business practices by the organization, without showing how these bad practices relate to the receipt of government grants.  See, e.g., Dhaliwal, 752 Fed. App'x. at 101 (concluding that the plaintiff could not show protected activity because "the actual concerns she raised" about her employer's poor business practices "appear to have had nothing to do with potential false claims," and because she never "expressed concerns to anyone . . . that these practices were illegal or may lead to the submission of false claims"); Ameti ex rel. United States v. Sikorsky Aircraft Corp., No. 3:14-CV-1223-VLB, 2017 WL 2636037, at *6 (D. Conn. June 19, 2017) (a plaintiff cannot show FCA protected conduct simply by alleging a fraudulent scheme existed "and concluding, that as a result of the fraudulent scheme, false claims must have been submitted"—an FCA claim cannot survive if the plaintiff "provides zero details identifying particular false claims").

Here, Liss asserts that Heritage submitted false or misleading claims for payment in its applications for government grant funding, in that Heritage certified compliance with regulations requiring financial accountability and management responsibility[7] at a time when Heritage was maintaining irregular financial management and governance practices and

---

[7]    As an example, Liss identifies a claim that Heritage submitted to HRSA in October 2017, and was awarded in January 2018.  (Docket entry no. 48-1.)  In its application packet for this grant, Heritage made a number of certifications about the practices that it would maintain in order to stay compliant with federal regulations, including promises to, inter alia: (1) "cause to be performed the required financial and compliance audits in accordance with . . . 45 CFR 75"; (2) "establish a proper accounting system in accordance with generally accepted accounting standards or agency directives"; (3) "comply with all applicable requirements of all . . . [federal] regulations and policies governing this program"; and (4) "adequately safeguard all assets and assure that they are used solely for authorized purposes" under 45 CFR 75.  (Id. at 4 ¶ 2, ¶ 3, ¶ 17, ¶ 18; 45 CFR § 75.302(b).)

experiencing fraudulent checks and bank transfers.  Liss maintains that, in submitting such funding applications, Heritage acted with reckless disregard for (or deliberate ignorance as to) the truth of these certifications, because Heritage was not in fact safeguarding its assets or keeping track of its funds.

Liss further asserts that, after performing her investigation of the suspicious checks and wire transfers, she formed a reasonable, good-faith belief that Heritage was (at worst) engaging in financial fraud by making illicit payments to Board members, or (at best) was failing in its duty to properly account for and safeguard federal grant money.  Heritage, on the other hand, contends that no reasonable person in such a situation would believe that Heritage was engaged in financial fraud upon the government—rather, Heritage contends that the only reasonable conclusion from these facts was that Heritage was the *victim* of fraud.

Viewing the evidence in the light most favorable to Liss, and drawing all reasonable inferences in her favor, the Court concludes that Liss has produced sufficient evidence to permit a reasonable fact finder to conclude that she has established the first element of an FCA retaliation claim – that she engaged in FCA-protected conduct.

Liss has proffered evidence showing that she had an "objectively reasonable basis" to believe that Heritage may have been engaging in financial fraud by making illicit payments to Board members.  Khurana, 511 F. Supp. 3d at 473.  Through investigating Heritage's bank accounts, Liss discovered that many thousands of dollars had been transferred (via checks and wire transfers) into accounts bearing the names of Saundra Alexander and Adrienne Thomas (both Board members), as well as Alvaro Simmons (a former CEO).  In her October 22 email to the Board, Liss specifically stated that her investigation "[led her] in good faith to believe that Saundra Alexander is involved in the transfer" of fraudulent funds, and she

subsequently concluded that Alexander, or someone else within Heritage management, may be attempting to "perpetuate a fraud against the federal healthcare system." (Docket entry no. 39-25, at 2; docket entry no. 49 ¶ 17.)  Heritage argues that such a belief by Liss would be unreasonable, as any reasonable person in this scenario would have concluded that Heritage was the victim, not the perpetrator, of this fraud.  Heritage notes that Detective Todd had concluded, long before Liss was ever hired, that the financial irregularities were the result of a fraudster targeting Heritage's accounts—not the result of any illicit actions by Heritage itself.  Viewing the evidence from Liss' perspective, however, it would be not be unreasonable for a new CEO who discovers suspicious, high-dollar amount transfers into the bank accounts of board members to suspect that those persons may be involved in fraud upon the organization.

Liss has also proffered evidence showing that she held a reasonable belief that Heritage was failing in its duty to safeguard government funds.  Most notably, although the suspicious banking activity had been occurring in Heritage's accounts since February 2018, Heritage did not become aware of these transfers until October 2018 (over seven months later). (Liss Add. 56.1 St. ¶ 58-62; docket entry no. 39-8, at 12-13.)  Liss "believed that the fact that these suspicious activities . . . had gone undetected by Heritage for so long, raised possible legal consequences for the organization itself because it demonstrated Heritage's inability to properly safeguard and account for government funds."  (Docket entry no. 49, ¶ 17.)  A factfinder could conclude that Liss' belief in this regard was reasonably held.

In sum, viewing the evidence in the light most favorable to Liss, Liss has produced sufficient evidence to permit a reasonable fact finder to conclude that she engaged in FCA protected conduct.

Notice of Protected Conduct

Next, the Court considers whether Liss has proffered sufficient evidence to establish that Heritage was aware of Liss' protected conduct—i.e., that Heritage knew that Liss was investigating potential financial fraud by or within the organization.  See Dhaliwal, 752 Fed. App'x at 100.  The Court finds the record sufficient to enable a reasonable fact finder to conclude that Heritage was on notice of Liss' protected activity.  Liss formally presented her concerns to Heritage management at the Board meeting on October 17, 2018.  Specifically, she informed the Board that "she made some discoveries of fraudulent checks, withdrawals, and online transfers" in Heritage's bank accounts, and "distributed copies of her findings to the Board members present."  (Docket entry no. 39-16, at 66.)  She then summarized her concerns in a detailed email sent to the Board on October 22, 2018.  In this email, she stated that she had uncovered "suspicious banking activities which I believe constitute federal crimes of intentional banking and healthcare fraud," and informed the Board that she intended to bring this matter "to the attention of federal regulators and state and federal authorities." (Docket entry no. 39-25, at 2-3.)  Liss further reported her concerns about the suspicious checks and transfers to HRSA representative Israel Garcia during the October 24, 2018, conference call in which Board members participated.  (Docket entry no. 48-5, at 10-11.)  Additionally, in accordance with the Board's instructions, Liss reported her concerns about the fraudulent checks and transfers to Detective Todd during their meeting on October 30, 2018.  (Docket entry no. 39-15, at 51-55.)

Heritage, however, contends that these actions were not enough, arguing that Liss must satisfy a heightened notice requirement because her investigations of Heritage's finances occurred in the course of her normal job duties.  See, e.g., Malanga v. NYU Langone Med. Ctr., No. 14-CV-9681-WHP, 2015 WL 7019819, at *3 (S.D.N.Y. Nov. 12, 2015) ("Certain courts

have held employees whose jobs require investigating fraud against the government to higher

pleading standards."); Ortiz v. Todres & Co., LLP, No. 15-CIV-1506-LGS, 2019 WL 1207856,

at *5 (S.D.N.Y. Mar. 14, 2019) ("An employee who simply engages in behavior wholly

consistent with his job description will not, without more, provide notice that he is engaging in a

protected activity.") (citation omitted).

Heritage's argument lacks merit, for several reasons.  First—as noted in the very

authority cited by Heritage—the heightened notice requirement is far from universally-accepted

law.  To the contrary, many courts have held that it is "doubtful" whether these "heightened

standards for notice survive[d] the 2009 amendments to the FCA and analogous revisions to the

NYFCA," given that the 2009 amendments significantly "broadened the scope of the FCA's

whistleblower provision" by providing protection for retaliation where the employee was

engaged in efforts to stop an FCA violation as well as those indicative of an employee's intent to

bring an FCA action.  Swanson v. Battery Park City Auth., No. 15-CV-6938-JPO, 2016 WL

3198309, at *5 (S.D.N.Y. June 8, 2016) (internal citation and quotation marks omitted).  Second,

it is unclear whether this heightened standard would even be triggered here, as the precise

parameters of Liss' job duties in relation to potential fraud are not entirely delineated on this

record.  The record is, however, sufficient to demonstrate that Liss put Heritage on notice that

fraud "against the federal healthcare system" was a concern that motivated her outreach to

outside regulators concerning the financial transactions.

Even if the heightened standard were applicable here, Liss still has done enough

to show that Heritage was aware of her conduct.  Under this heightened standard, some of the

ways in which an employee can prove notice is by "acting outside her normal job

responsibilities, notifying a party outside the usual chain of command, advising defendant to hire

counsel, or taking any other action which . . . would put defendant on notice that litigation was a reasonable possibility." Swanson, 2016 WL 3198309, at *5. Liss engaged in several of these activities—she reported her fraud suspicions to several parties outside of the chain of command (such as the HRSA representative and law enforcement); and in her October 22 email to Board members she made clear that she was contemplating litigation, by stating that she had brought the alleged fraud to the attention of outside regulators, that she "will not permit you or anyone for that matter to retaliate against me or to perpetuate a fraud against the federal healthcare system," and advised the Board members "to put your individual insurance carriers on notice that . . . I will bring individual action against each and every one of you." (Docket entry no. 39-25, at 3.) Accordingly, Liss has proffered sufficient evidence to permit a reasonable fact finder to conclude that Heritage was on notice of her protected activity.

Adverse Action and Causation

The final element of an FCA retaliation claim "requires proof of both adverse action and causation." Khurana, 511 F. Supp. 3d at 477. Here, it is undisputed that Liss suffered adverse action, in that her employment was terminated by Heritage on October 30, 2018. See 31 U.S.C. § 3730(h)(1) (for purposes of the FCA, adverse action occurs when an employee "is discharged").

The second question is whether Liss has demonstrated that her termination occurred "because of" her disclosure of her concerns regarding fraudulent activity in connection with the government grants. Khurana, 511 F. Supp. 3d at 479. In interpreting what it means for an adverse action to occur "because of" an employee's protected activity, courts in the Second Circuit have most commonly held "that the but-for standard [of causation] is the appropriate

one."  Id.  But-for causation "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013) (citation omitted).  Thus, Liss must demonstrate that, had she not brought to light the suspected financial fraud, her employment would not have been terminated.

Additionally, in addressing the causation element of an FCA retaliation claim, "the Second Circuit has implicitly endorsed the application of the McDonnell Douglas framework to Section 3730(h) claims."  Forkell v. Lott Assisted Living Corp., No. 10-CV-5765-NRB, 2012 WL 1901199, at *10 (S.D.N.Y. May 21, 2012) (citing Liburd v. Bronx Lebanon Hosp. Ctr., 372 F. App'x 137, 139 (2d Cir. 2010)).  This framework involves three phases:  (1) the employee bears the initial burden of producing evidence sufficient to support a prima facie case of retaliation; (2) the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; and (3) the burden shifts back to the employee to demonstrate that the employer's stated reason is a pretext for retaliation.  See id., (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)).

Liss must first produce evidence sufficient to support a prima face case of retaliation by Heritage.  A prima facie case requires only a "de minimis" showing of "(1) participation in a protected activity; (2) the defendant's knowledge of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."  Zann, 737 F.3d at 844.  As explained above, Liss has produced evidence sufficient to allow a reasonable fact finder to conclude that she engaged in a protected activity that Heritage knew about, and that she suffered adverse action thereafter.  As for the causal connection required for a prima facie showing, "a plaintiff can indirectly establish a

causal connection to support a retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Id. at 845 (citation and quotation marks omitted).   Here, Liss was fired thirteen days after she first made her report to the Board. (Heritage 56.1 St. ¶ 11-15.)  This short period of time that elapsed between her report and her termination is enough to satisfy the de minimis causation standard for Liss' prima facie case. See Zann, 737 F.3d at 844. ("The three-week period from [plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation[.]").  Thus, for purposes of a prima facie case, Liss has offered enough evidence to support an inference that she would not have been terminated but for her reporting of the suspected financial fraud.

The burden then shifts to Heritage to articulate a legitimate, non-retaliatory reason for Liss' termination.  Heritage asserts that the reason for the termination was Liss' "inappropriate behavior towards staff," as evidenced by the "numerous" staff complaints about Liss' "insensitive and condescending behavior and attitude" during her first six months on the job.  (Docket entry no. 36, at 21.)  Heritage also points out that the complaints about Liss were discussed (and a termination proposal was prepared) prior to Liss' financial presentation at the October 17, 2018 board meeting and subsequent reports.  Liss, however, disputes these accounts and characterizations—while she does not deny that the staff complaints existed, she denies that she engaged in any of the conduct that staff members complained of.  (Docket entry no. 49, ¶ 38-41; Liss Counter 56.1 St. ¶ 6.)  Liss contends that summary judgment would be inappropriate because there are material disputes regarding the true cause of the termination of her employment.

The relevant inquiry here is not the truthfulness of the underlying staff complaints but, rather, the employer's motivation and reasonableness in acting upon those complaints.  As

an example, in <u>Regimbald</u>, the court concluded that complaints filed about the plaintiff's

workplace behavior constituted "a legitimate, non-retaliatory reason for [his] firing," despite the

plaintiff's insistence that the complaints were factually untrue.  <u>Regimbald v. Gen. Elec. Co.</u>, No.

2:05-CV-161, 2007 WL 128963, at *4-5 (D. Vt. Jan. 12, 2007).  The plaintiff claimed that "other

employees fabricated stories about him" and that their accounts of his actions were false, and

thus that summary judgment was inappropriate.  <u>Id.</u>  The court rejected this notion, explaining

that "[t]he fact that [plaintiff] contests the truthfulness of [his co-workers' statements] does not

create a genuine issue of material fact for trial."  <u>Id.</u>  "[T]he relevant inquiry is not whether all of

the facts underlying the employer's decision were accurate . . . the question is whether, based

upon the available information, the employer fired the plaintiff for legitimate, non-retaliatory

reasons."  <u>Id.; see also</u> <u>McPherson v. New York City Dep't of Educ.</u>, 457 F.3d 211, 216 (2d Cir.

2006) ("[Courts] are decidedly not interested in the truth of the allegations against plaintiff.

[They] are interested in what motivated the employer . . . the factual validity of the underlying

imputation against the employee is not at issue.") (citation omitted).  Accordingly, the relevant

question is whether, based upon the information presented to Heritage in the staff complaints,

Heritage had a legitimate reason for discharging Liss and acted on the basis of that information.

The Court concludes that, even viewing the evidence in the light most favorable to Liss, Heritage

has indeed produced evidence from which a reasonable fact finder could conclude that Heritage

had a legitimate reason for Liss' termination.

   "[I]t is beyond dispute that an employer may terminate an employee based on

inappropriate comments, perceived insubordination, or disruptive behavior in the workplace."

<u>Forkell</u>, 2012 WL 1901199, at *11; <u>see</u> <u>also</u> <u>Khurana</u>, 511 F. Supp. 3d at 480-81 (employer had

"legitimate, non-retaliatory reasons" to terminate the plaintiff due to his "repeated flouting of the

proper chain of command," his "inability to get along with his coworkers," and his "difficult"

personality).  In the present case, from May 2018 to October 2018, five different Heritage staff

members, from a variety of positions within the organization, lodged complaints about Liss'

behavior and comments in the workplace.  For example, HR Director Jamela Irvin reported that

Liss "spoke down to her in a derogatory way," (docket entry no. 39-3 ¶ 11); Director of

Operations Jennifer Martinez reported that Liss made "incredibly insensitive" remarks about

Heritage's "mostly minority staff and patient base," (docket entry no. 39-4 ¶ 2-3); staff member

Felishea Velasquez Sanchez filed a complaint stating that Liss has "created an uncomfortable

atmosphere" amongst the staff and that made her feel "bullied, picked on, and harassed," (docket

entry no. 39-18);  Facilities Director Norman Rodgers complained that he "witnessed Liss make

offensive and racially insensitive comments about me and about others," (docket entry no. 39-5 ¶

1-4); and staff member Erica Hutchek reported that she was "upset and disappointed" by Liss'

mistreatment of her, (docket entry no. 39-6 ¶ 1-6.).  At the emergency Board meeting held on

October 30, 2018, staff members relayed these complaints to the Board, and they also showed

the Board a recording of Liss speaking to Adrienne Thomas "in a rude and aggressive manner" at

the workplace.  (Docket entry no. 39-3 ¶ 22-24.)  The Board members found these complaints to

be very concerning, and one Board member (Mr. Blomberg) even went so far as to tell the Board

that he would "exit[] the organization" if Liss were not terminated.  (Docket entry no 39-8, at 29-

30.)  Ultimately, the Board voted unanimously to terminate Liss, attributing the decision to these

staff complaints.  (Docket entry no. 39-3 ¶ 23-24.)  Thus, Heritage has carried its burden of

showing that it had a legitimate, non-retaliatory reason for Liss' termination.

   Under the final step of the <u>McDonnell Douglas</u> framework, the burden shifts back

to Liss to demonstrate that Heritage's proffered reasons for her termination were false and were

instead a mere pretext for retaliation.  "To rebut a legitimate, non-discriminatory basis of dismissal, a plaintiff is 'obliged to produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, nondiscriminatory reasons proffered by the employer were false, and that more likely than not retaliation was the real reason for the discharge.'"  Regimbald, 2007 WL 128963, at *6 (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 714 (2d Cir. 1996)).  A plaintiff will not succeed in showing her employer's rationale is pretextual when her arguments are overly speculative, "are premised solely upon [her] own contentions, [or are] contradicted and unsupported by direct or circumstantial evidence[.]"  Plotzker v. Kips Bay Endoscopy Ctr., LLC, No. 12-CIV-9255-GBD, 2017 WL 4326061, at *7 (S.D.N.Y. Sept. 8, 2017), aff'd sub nom. Plotzker v. Kips Bay Anesthesia, P.C., 745 F. App'x 436 (2d Cir. 2018).

   Liss asserts that evidence of Heritage's pretext can be found in improper procedures that the Board utilized to terminate her, and in the close timing of her termination following her presentation to the Board about financial irregularities.  Heritage asserts that its reasons were clearly not pretextual, because it formed the decision to fire Liss before she ever brought her fraud concerns to the Board's attention.  Drawing all reasonable inferences in Liss' favor, the Court concludes that no reasonable juror could find that Heritage's stated reasons for Liss' termination were a pretext for retaliation.

   The timeline of events leading up to Liss' termination shows that the Board's concerns about Liss' attitude and performance predated any reports she made about suspected fraud, and that the Board did not take any actions to dissuade or discourage Liss from reporting her fraud suspicions.  Liss acknowledges that Heritage received several complaints about her behavior towards staff and clients, during the span of her probationary period (May 2018 to

October 2018).  In late September 2018, several Board members attended a meeting of Heritage

staff, and informed them that the Board "would be addressing the problems" with Liss.  (Docket

entry no. 39-3, ¶ 17.)  By early October 2018, Adrienne Thomas had already made up her mind

that Liss should be discharged, based upon "the many complaints [Thomas] received about her."

(Id. ¶ 17-26.)  Thomas began to prepare a presentation advocating for Liss' termination, and

informed at least three other Board members that she wanted to terminate Liss.  (Id. ¶ 17-26.)

All of this occurred prior to the October 17, 2018 meeting (during which Liss first informed the

Board of her fraud suspicions). [8]

        The record includes evidence that, after Liss raised her suspicions of financial

fraud[9] at the October 18 meeting, the Board "was not offended or bothered that Liss raised these

issues," and "did not hold it against Liss that she made this report."  (Docket entry no. 39-11 ¶

13-14.)  In fact, as soon as Liss finished her presentation to the Board at the October 18 meeting,

the Board encouraged her to share her concerns with law enforcement as soon as possible.  (Id.)

        During the second half of the October 17, 2018 meeting (after Liss had departed),

Thomas handed out premade folders detailing all of the staff complaints against Liss, which

further indicates that Thomas had planned in advance to advocate for Liss' termination.

---

[8]     Liss acknowledges that she was aware that Thomas was advocating for her discharge
        prior to the October 17 meeting.  (Docket entry no. 39-16, at 58-64; Liss Add. 56.1 St. ¶
        66-67; Liss Counter 56.1 St. ¶ 8-10.)

[9]     Notably, Liss was not actually the first person to discover the suspicious activities in
        Heritage's bank accounts—these suspicious transfers and fraudulent checks were
        discovered by CFO Doug Blomberg in fall 2018, when he was performing an audit of
        Heritage's accounts.  (Liss Add. 56.1 St. ¶ 50-58.)  Additionally, Heritage had previously
        experienced issues with similar suspicious account activity back in 2017, which was
        investigated by Detective Todd.  (Docket entry no. 39-15, at 19-35.)

(Heritage 56.1 St. ¶ 10-11.)  When presented with these complaints about Liss and Thomas'

recommendation of termination, some Board members were inclined to vote to terminate Liss

immediately, but other Board members requested more time to deliberate—indicating that the

ultimate termination decision was not a hasty one.  (Heritage 56.1 St. ¶ 10-11; Liss Counter 56.1

St. ¶ 8-11.)  The Board voted at the meeting to extend her probationary agreement for the time

being, and decided to give her an oral performance review.  (Id.)

Following Liss' October 22 email to the Board (in which she characterized the

extension of her probationary status as a retaliatory act), Board member Wanda Garcia

communicated with the Board to request an emergency meeting to address Liss' allegations, and

the emergency meeting was scheduled for October 30.  (Liss Add. 56.1 St. ¶ 103-104.)  On

October 24, 2018, Adrienne Thomas sent a letter to the Board in response to the October 22

email from Liss.  (Docket entry no. 39-26.)  Thomas stated that the Board was "glad to have

been notified" that the suspected financial fraud was being "reported to the proper agencies who

can resolve this situation."  (Id.)  Thomas further stated that it was "unfortunate that Ms. Liss

feels as though she is being retaliated against" due to the extension of her probationary period,

but asserted that the Board had reached this decision due to Liss' poor relationship with Heritage

staff, and her "irrational" and "unprofessional" behavior.  (Id.)  Thomas also expressed concern

that Heritage might "face several lawsuits in the future should the Board allow Ms. Liss to

remain in her current position."  (Id.)  At the October 30 emergency meeting, the Board

ultimately voted unanimously to terminate Liss' employment, after several staff members voiced

their complaints about Liss, and a staff member played a video recording of Liss speaking to

Adrienne Thomas in "a rude and aggressive manner" at the workplace.  (Heritage 56.1 St. ¶ 13-

15; docket entry no. 39-4 ¶ 7-8; no. 39-3 ¶ 23.)

In sum, a reasonable juror could not conclude on this record, viewed in the light most favorable to Liss, that Liss' presentation about suspected fraud was "more likely than not . . . the real reason for [her] discharge," <u>Regimbald</u>, 2007 WL 128963, at *6, because (1) some Board members had already formed the intention to terminate Liss (based on her behavior towards staff) before she ever made any disclosures about suspected financial fraud; (2) the Board reacted appropriately to Liss' reports about the financial irregularities and encouraged her to share her concerns with the proper authorities; (3) financial irregularities (like suspicious transfers) in Heritage's bank accounts were not a new issue for the organization, and Board members were already aware of such issues occurring in the past; and (4) Liss was not, in fact, the first person to uncover these suspicious transfers—they were discovered by Mr. Blomberg (who did not face any adverse action).

Liss, however, argues that Thomas' unilateral spearheading of the effort to terminate her was improper under Heritage's internal governance policies, and that the irregularity raises a question about the good faith of the decision and lends evidence of pretext. <u>See</u>, <u>e.g.</u>, <u>Stern v. Trs. of Columbia Univ.</u>, 131 F.3d 305, 313 (2d Cir. 1997) ("[D]epartures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the decision.") (citation omitted).  The Court is not persuaded by this argument, for two reasons.  First, even assuming that Thomas' actions violated Heritage's internal policies, the irregularity has nothing to do with whether the decision to discharge Liss was a pretext for unlawful retaliation—a potential violation of internal policies does not any shed light onto Heritage's motivation for terminating Liss.  Second, this argument is immaterial because, as explained above, Thomas' efforts to fire Liss predated Liss' disclosures to the Board regarding the financial irregularities.

Liss also argues that the timing of her termination was very suspect and weighs heavily in favor of Heritage's decision being pretextual.  She notes that she was fired less than two weeks after making her presentation to the Board, and that the emergency meeting to discuss her termination was scheduled almost immediately after she sent her accusatory email to the Board on the evening of October 22.  Even so, the Court concludes that the evidence is still insufficient to raise a genuine issue of material fact as to the legitimacy of Heritage's proffered reason for her termination.  While it is true that "temporal proximity" evidence is often an important factor in showing an employer's retaliatory motive, the relevance of such temporal proximity evidence may be "clouded" by "other events occurring around the same time period." Regimbald, 2007 WL 128963, at *4.  For example, in Regimbald the court concluded that, even though the plaintiff was fired shortly after the protected activity, the timing issue was "clouded" because there had also been "complaints of inappropriate conduct [by plaintiff]" which occurred "in the weeks prior to" his protected conduct.  Id.  The plaintiff accordingly "failed to rebut [the employer's] evidence with his own showing of pretext."  Id. at *6.  See also Holt v. KMI–Continental, Inc., 95 F.3d 123, 130–31 (2d Cir. 1996) (affirming summary judgment where plaintiff's only showing of pretext was temporal proximity and the employer demonstrated that she was fired for poor performance, being "disruptive in the office," and being "unable to get along with her colleagues").  Liss' evidence of temporal proximity between her protected activity and her termination is likewise insufficient to rebut Heritage's evidence that strong, independent grounds for termination of her employment predated her protected activity, and that Heritage's decision was based on those pre-existing grounds.  In other words, Liss cannot establish that, but for her reports on the suspected fraud, her termination would not have occurred.  Accordingly, because Liss is unable to establish a key element of her FCA retaliation claim—causation—the

Court concludes that Heritage is entitled as a matter of law to summary judgment dismissing

Liss' retaliation claim.


CONCLUSION

      For the foregoing reasons, Heritage's motion for summary judgment is granted.

The Clerk's Office is respectfully directed to enter judgment in favor of Heritage and close this

case.  This Memorandum Order and Opinion resolves docket entry no. 35.

      SO ORDERED.

Dated: New York, New York
      February 27, 2023

                         /s/ Laura Taylor Swain
                        LAURA TAYLOR SWAIN
                        Chief United States District Judge